# United States Bankruptcy Court
## District of Massachusetts

In re
**PLYMOUTH RUBBER COMPANY, INC.,**
and
**BRITE-LINE TECHNOLOGIES, INC.,**

Debtors

Chapter 11
Case No. 05-16088-JNF
Jointly Administered

## MEMORANDUM

### I. INTRODUCTION

The matter before the Court for determination is the "Motion for Authority to Make Payments Pursuant to Employee Retention Plan" with exhibits (the "Motion") filed by jointly administered Debtors, Plymouth Rubber Company, Inc. ("Plymouth Rubber") and Brite-Line Technologies, Inc., (collectively, the "Debtors") through which the Debtors seek a determination that severance benefits owed to employees once they are terminated during the wind-down of Plymouth Rubber's Canton, Massachusetts manufacturing operations are entitled to administrative expense priority under 11 U.S.C. § 503(b)(1). The Debtors also seek authority to pay the employees' claims once they are terminated. The Unsecured Creditors' Committee (the "Committee") and LaSalle Bank National Association (the "Bank") have filed Oppositions to the Motion. Following an initial hearing held on December 13, 2005, the Debtors submitted the

1

"Affidavit of Maurice Hamilburg in Support of Debtors' Employee Retention Plan." The Bank's and the Committee's attorneys examined Mr. Hamilburg, the President of Plymouth Rubber, at an evidentiary hearing held on December 20, 2005. Also at that hearing, four exhibits were introduced into evidence. Based upon the evidence presented, the arguments of counsel at the hearings held on December 13, 2005 and December 20, 2005, the entire record of proceedings in these Chapter 11 cases, and the law applicable to the priority of severance plan payments in this circuit, the Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

In March of 2005, prior to the filing of the Debtors' Chapter 11 petitions, Plymouth Rubber announced its intention to terminate all manufacturing operations and all manufacturing employment at its Canton, Massachusetts plant. Plymouth Rubber planned to terminate Canton employees in several phases, beginning in March 2006 and ending sometime in 2007, pending the transition of its manufacturing operations to China. In June of 2005, the Debtor adopted the "Plymouth Rubber Severance Pay Plan" (the "Plan") and Plymouth Rubber gave notice to each affected employee advising them of the amount they would be entitled to receive upon termination under the Plan. There was no evidence presented that Plymouth Rubber had a severance pay program prior to the Plan. One of the central purposes of the Plan was and is to create an incentive for employees to continue to work for Plymouth

2

Rubber and not to quit prior to the elimination of their jobs upon the transition. The Plan provides for continuation of pay with benefits for periods varying in length after the elimination of a position. Entitlement to the payments is conditional on Plymouth Rubber's continued operations and on each employee's successful performance of their job until termination. In essence, under the Plan, an employee would be entitled to severance pay according to a formula upon termination on the condition that the employee remain with Plymouth Rubber until it terminates the employee's job. In other words, if the employee voluntarily quits, he would not be entitled to any severance benefit under the Plan. The amount of benefits for each affected employee is based on such employee's years of service and job category. Although the Plan was announced prior to the commencement of this case, the implementation of the Plan did not occur prior to the commencement of this Chapter 11 case. The terms of the Plan compel the conclusion that the Plan is a hybrid severance and retention plan.

The Debtors seek approval of the Plan by the Court and authority to make any payments under the Plan pending confirmation of a plan of reorganization. The Debtors maintain that approval of the Plan at this stage is essential to deter employees from quitting, to maintain current operations, to avoid losses and to successfully implement the transition plan. Mr. Hamilburg stated in his affidavit that since the commencement of this case, there has been an 18 percent increase in voluntary quits at Plymouth Rubber on an annualized basis, and without retaining experienced employees, Plymouth Rubber may not be able to sustain operations through March

3

2006, jeopardizing its business plan and reorganization. He emphasized that the employees need to know now whether their severance/retention benefits will be paid so that they can make a decision on whether to remain with Plymouth Rubber. The Debtors recognize that they do not have cash collateral authority to make payments under the Plan, and they agree that no claims shall be paid except as benefits arise subject to cash collateral authority or other financing.

The Bank and the Committee object to the Motion on various grounds. The Bank maintains that the Debtors do not have the ability to satisfy the administrative expense claims for which approval is sought, pointing out that the Debtors do not have authority to use cash collateral to satisfy the administrative expense claims which are likely to total more than $2.8 million over the course of the transition, and the Debtors do not have other funds to satisfy the obligations. The Bank contends that approval of the Motion is premature and that the Motion should be denied or continued until confirmation of the Debtors' Plan. The Committee urges the Court to deny the Motion on the grounds that the Debtors cannot afford to pay the obligations, the Debtors have not sustained their burden of showing proper business judgment in adopting the Plan, the Plan is overly broad and should be limited to only essential employees, and that the claims for severance pay are not entitled to administrative expense priority status under applicable First Circuit authority.

The Court finds that the Plan is a pre-petition contract adopted by Plymouth Rubber for the purpose of providing incentive for employees to remain with Plymouth

4

Rubber as its winds down its operations and to forego other employment opportunities during this period. Despite its pre-petition formulation, the Plan's implementation is to occur post-petition, and entitlement under the Plan is based solely on post-petition services of employees. Both before and after the commencement of this case, Plymouth Rubber has induced employees to remain in its employment based on the promise that they will receive severance benefits upon termination if they remain with Plymouth Rubber until termination. The employees' right to benefits under the Plan are conditional upon their continued performance of their jobs and staying with Plymouth Rubber until terminated. Plymouth Rubber has induced employees to remain with it based on its promise that the Plan will be honored, subject to compliance with the Plan's conditions and approval by the Bankruptcy Court  The Plan is not a traditional key employee retention plan, a so-called KERP; it is an across the board program available to all employees who decide to remain with Plymouth Rubber during the Chapter 11 case until they are terminated.

## III. DISCUSSION

The Plan in this case is an executory contract because there is performance due to some extent on both sides. See N.L.R.B. v. Bildisco, 465 U.S. 513, 522 (1984). However, the Debtors have not filed a motion to assume the Plan, and they have not yet filed a plan of reorganization, which could provide for assumption or rejection of the Plan. Presumably, due to the relief requested in this Motion, it appears that the Debtors intend to assume the Plan as an executory contract under 11 U.S.C. § 365(a). At

5

this point, however, because the future of the case is uncertain, assumption is uncertain as well. The status of the contract is thus in the limbo stage of pre-assumption or pre-rejection, pending the decision to assume or reject.

The case law in this circuit on the issue of whether severance pay is entitled to an administrative expense priority under § 503(b) is more strict than in other jurisdictions. *Compare* Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart Inc.), 536 F. 2d 950 (1st Cir. 1976) *with* Straus-Duparquet, Inc. v. Local Union No. 3 Int'l Bhd. of Electical Workers, 386 F. 2d 649 (2d Cir. 1967) *and* Lasky v. Phone For All, Inc. (In re Phone for All, Inc.), 288 F. 3d 730 (5th Cir. 2002). The facts in Mammoth Mart, *supra*, are significant to understanding the scope of the court's holding. There, employees who were discharged after bankruptcy were paid four weeks of severance pay; however they claimed that they were owed additional severance pay due to length of service with the debtor as the pre-petition policy was to pay one week's salary for each year of service. The First Circuit Court of Appeals determined that the former employees' claims for severance pay based on services provided pre-petition were not entitled to administrative priority under Bankruptcy Act § 64a(1), the predecessor to § 503(b). The rationale for the court's ruling was that the employees' right to payment arose and was earned pre-petition for services performed prior and thus did not arise from a transaction with or inure to the benefit of the debtor-in-possession. Mammoth Mart, 536 F. 2d at 954. In its opinion, the Court of Appeals did not foreclose the allowance of administrative expense priority for severance pay claims, and indeed provided two

6

scenarios under which employees' claims could be entitled to administrative priority. First, if the debtor-in-possession assumes an employment contract providing that all discharged employees are entitled to their salaries for a period following the discharge as severance pay, priority treatment would be appropriate. Id. at 953. Secondly, if the claim for severance pay arose from a transaction with the debtor-in-possession it would be entitled to administrative treatment to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business. Id. at 954. The Court stated: "It follows that whether a claim for severance pay based upon an unrejected contract with the debtor. . . will be entitled to . . . priority will depend upon the extent to which the consideration supporting the claim was supplied during reorganization. If an employment contract provides that all discharged employees will receive severance pay equal to their salaries for a specified period, the consideration supporting the claim being an employee in good standing at the time of the discharge will have been supplied during the arrangement, and the former employee will be entitled to priority." Id. at 955. The severance claim would be entitled to administrative priority "... if the debtor-in-possession had, to induce the employees to remain on the job, promised them that, if discharged, they would receive severance pay based on the prior practice . . . [t]hen the consideration supporting . . . [their] claims would be the services performed subsequent to the debtor-in-possession's promise. Id. at 955, n.4. Thus, under Mammoth Mart, a new promise of severance pay to induce employees to stay, coupled with benefit to the

7

debtor, will result in an administrative priority. Stated simply, if during the Chapter 11 case, employees continue to work during the reorganization based upon a new promise of severance pay on discharge, the employees' severance claim will be entitled to priority. Under this circumstance, the severance claims are not based on pre-petition services, and are not merely non-priority unsecured claims. Instead, where severance benefits are a component of compensation for post-petition services, they deserve administrative priority.

The employees' potential claims for retention/severance benefits in this case qualify under the second <u>Mammoth Mart</u> test for administrative priority. First, I find that the employees who have stayed with Plymouth Rubber through this date have done so based upon the Debtors' representation that payments under the Plan will be made. The Debtors have induced the employees to render performance pending their decision to assume the obligations under the Plan, and based upon the promise of a priority claim for benefits under the Plan to the employees who remain.

Second, I find that the Debtors have demonstrated that the consideration supporting the employees' claim for severance has and will be supplied on a post-petition basis to the benefit of the Debtors' estates. The purpose of the Plan is to induce employees to remain with Plymouth Rubber while it transitions its manufacturing operations abroad and attempts to reorganize. The condition of entitlement to severance is remaining with Plymouth Rubber during the reorganization until notice of termination; entitlement is not related to pre-petition service, only the amount of an

8

employee's benefit is related to his or her pre-petition service. The consideration is to forego other employment opportunities post-bankruptcy in consideration of post-petition services.

The Plan is also beneficial to the Debtors' estates as it is necessary to stem a demonstrated turnover risk in a competitive environment. Mr. Hamilburg stated in his affidavit that competitors have been inquiring about hiring Plymouth Rubber employees and that a loss of its skilled employees will be disruptive to the company. The Debtors have also shown that if a number of employees quit prematurely, there will be a negative effect on operations, the Debtors' ability to retain customers and thus reorganize. Moreover, the Debtors have shown that it is necessary to maintain operations and a sufficient work force until each phase of the transition is complete and that the Plan is an essential component of reorganization. Accordingly, I find that the employees' potential claims for retention/severance benefits in this case qualify under the second <u>Mammoth Mart</u> test for administrative priority.

The decision of the First Circuit Court of Appeals in <u>Mason v. Official Comm. of Unsecured Creditors (In re FBI Distribution Corp.)</u>, 330 F. 3d 36 (1st. Cir. 2003) does not warrant a different result. There, the court considered the priority of claims arising out of an executive employment agreement that included both a lump sum severance payment upon termination as well as a payment due upon a sale or change in control. The court ruled that the consideration supplied by the executive for severance was the act of foregoing other employment which occurred pre-petition, and there was no

9

consideration supplied to the estate post-petition which would justify administrative expense treatment. <u>FBI Distribution</u> at 46. Morever, because the severance pay portion was an executory contract, and it was rejected, breach was deemed to have occurred pre-petition. <u>Id</u>. Accordingly, in <u>FBI Distribution</u>, the severance claims were unsecured claims, not administrative expenses.

The claims in the present case have not yet matured, and the Court will not authorize payment of them as administrative expenses with priority under § 503(b) until the employees actually become entitled to payment under the Plan. It is inevitable however that claims will mature, beginning in March 2006, and thus employees are entitled to a determination of the priority of their claims. The Court finds that the benefits under the Plan qualify for administrative expense status once they mature.

The question remains as to how the Debtors shall pay these administrative expenses once the employees' right to payment arises. This is not an issue for today, however, because the terminations are not expected to begin to occur until March of 2006 and the terminations will only then occur in phases; thus the employees' right to payments under the Plan has not yet arisen. Moreover, as the Bank points out, the Debtors do not have authority to expend cash collateral for the purpose of making the payments under the Plan. The Debtors alluded to financing for the purposes of funding a Chapter 11 plan, however, that plan has yet to be filed and the terms of any commitment for exit financing have not been the subject of any pleading filed with this

10

Court. Accordingly, despite the status of the unmatured claims as administrative expenses, the Court finds that the Debtors' request for authority to make payments pursuant to the Plan is premature. The Court will schedule a further hearing on the request for authority to make payments under the Plan at the hearing to be held on January 5, 2006.

Accordingly, the Court shall enter an order allowing the Motion in part and continuing it in part and overruling the Oppositions in part and sustaining them in part.

Dated: December 30, 2005

By the Court

*[signature]*
Joan N. Feeney
United States Bankruptcy Judge

11